### STATE v. NELLIE AND ROBERT CARR.

#### (Filed 10 October, 1928.)

**1. Evidence—Expert Testimony—Subjects of Expert Testimony.**

In an action for homicide wherein the issue is dependent upon whether the deceased committed suicide or the defendants killed him, medical expert testimony that the deceased could not have killed himself with the gun is incompetent, the conclusion being in effect an answer to the only issue submitted to the jury, and being within the knowledge of an ordinary man, and one that the jury should have reached themselves in answering the issue submitted as to the defendant's guilt or innocence of the offense.

**2. Criminal Law—Evidence—Weight and Sufficiency.**

A defendant may not be convicted as an accomplice or fellow conspirator of another in committing a homicide, upon evidence that does not amount to more than a speculation or conjecture.

**3. Criminal Law—Appeal and Error—Review—New Trial.**

Where material evidence admitted on the trial of a homicide should have been excluded, a new trial will be granted in the Supreme Court on appeal.

**4. Criminal Law—Evidence—Weight and Sufficiency.**

Where evidence is conflicting in a criminal case and where, considering the evidence in the light most favorable to the State, the jury might find the defendant guilty, a motion as of nonsuit is properly denied. C. S., 4643.

APPEAL by defendants from *Grady, J.,* at July Term, 1928, of DUPLIN.

Nellie Carr, Robert Carr, James Carr, Graham Carr, ·and Willie Carr were indicted for the murder of Will Carr, the husband of Nellie and the father of the other defendants, on the night of 8 October, 1927. At the close of the State's evidence James Carr was discharged, and on the trial Nellie and Robert were convicted of manslaughter, and the others were acquitted. From the judgment pronounced Nellie and Robert appealed upon error assigned.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*George R. Ward and Rivers D. Johnson for appellants.*

ADAMS, J. The evidence tends to show the following circumstances: The deceased and his family lived on the second floor of a house used for packing tobacco. The room was about twenty-four steps long, and had one door opening from a porch on the front which was reached by a stairway. Near the middle of the room was a curtain intended as a partition, the space occupied by the deceased and his wife being on the north side and on the south the space occupied by the children. There was a window in the rear of the room. The bed on which Robert and his wife slept was between the door and the curtain. The other children were sleeping on the porch when their father came to his death. The bed occupied by the deceased was in the northeast corner of the room. His death occurred a little while before midnight.

Nellie Carr testified that she was forty-three years of age, had been married twenty-six years, had lived peaceably with her husband; that he had recently begun to drink and to "take dope," and on the afternoon preceding his death had come home intoxicated. In reference to his death she said: "On the same night, and before he shot himself, he was lying on the bed and I was sitting on the trunk. He raised up, and his pants were hanging on the wall of the house, and he took his pistol out of his pants pocket and turned to the wall and shoots that way five times.

I was on the trunk and I said, 'Willie, what in the world do you mean shooting this time of night? The folks won't know what to think of you.' He never said a word to me. After a while Graham came in. He had been to church, and he went to sleep out on the porch. Willie Henry, my boy, and Marie, my girl, were sleeping on the porch that night because it was so hot. Robert and his wife came home on the truck, just before Will shot himself. After he shot in the wall, he laid back on the bed, and after a while I heard the truck coming, and Will called to me to bring him some matches. He had cover (quilt) around him, and he said 'Get me the matches,' and I handed him the matches and he said, 'I don't want that,' and I said, 'The boys say they won't strike without the box.' He took the matches and said to me: 'I am going to burn up these things.' I said, 'Don't you know if you burn up these things you will burn up yourself, and us and what is below you?' And I turned off and the gun fired. The load hit him in the right temple, and I looked him over and commenced to holler, and Willie Henry and Robert ran to me, and I told them to go get Mr. Gaylor (who is the magistrate at Magnolia) and Mr. Potter (our neighbor) and somebody there. . . . I didn't know where the gun was when I was talking with him about burning the things up. He was sitting on the bed, towards the foot, on the edge of the bed, and he fell right back over. He was on the bed when I grabbed him. When the gun fired I looked. The gun fell on the floor. I didn't look for any gun—didn't know he had one there. I was right at him, but didn't see the gun; he must have had it under the cover. I didn't see the gun. I knew he had the pistol in the bed. He was shooting with that before he killed himself. He was lying flat down when he was shooting with the pistol."

Dr. Quinn, a witness for the State, testified as follows: "I examined the body of Will Carr and found him on the bed as has been described, lying cross-wise with the right side of his head towards the front of the house, on his back. I probed the wound, which was about two inches above his right eye, and the load went in downward. I found the wound in the head, one shot in the collar bone and around his neck and face. There were no powder stains that I could tell. I did not get any of the shot or discover any other wound on his body. From my examination the wound was made with a shot gun No. 6 shot." "Q. From the position the body was lying in, from your examination of it, have you an opinion as to whether that wound could have been made by a gun in the hands of this deceased or not? A. I don't think it is possible for the deceased to have fired the gun and made the wound that I saw." The defendants excepted to the question and the answer. This evidence should have been excluded. The defense was suicide. The ultimate issue

for the jury was whether in truth the deceased had fired the gun; but notwithstanding positive evidence to the contrary, the witness was permitted to make an unqualified negative answer. As a rule the witness is required to state the facts he observed and relied on as the basis of his opinion so far as they permit of a detailed enumeration. Such a statement of the facts affords an opportunity of testing the reasonableness of his inference, for a witness may not express an opinion which finds no support in the facts he enumerates. Here the question called for an answer not necessarily involving a matter of science and not based upon an enumeration of circumstances into the truth of which it was the province of the jury to inquire. The objection to disregarding this rule is that for their own inference from the facts the jury may substitute that of the witness. 22 C. J., 551.

In the next place the answer invades the province of the jury. For the reason that it is difficult to explain a combination of facts in such a way as to enable the jury to deduce a logical conclusion, it often happens that the testimony of a witness is essentially an expression of opinion. But the exception to the general rule which excludes opinion evidence is subject to the limitation that the opinion or inference of the witness must not be an answer to the exact issue which the jury is to determine. When the witness testified that he did not think it possible for the deceased to have fired the gun and to have made the wound he necessarily testified in effect that in his opinion the deceased did not kill himself. True, the "exact issue" was whether the defendants are guilty, but if the deceased killed himself the conclusion that the defendants did not kill him would necessarily follow. *Summerlin v. R. R.,* 133 N. C., 551, 555; *Lynch v. Mfg. Co.,* 167 N. C., 98; *Gray v. R. R., ibid.,* 433; *Kerner v. R. R.,* 170 N. C., 94; *Marshall v. Telephone Co.,* 181 N. C., 292; *Stanley v. Lumber Co.,* 184 N. C., 302. The exact question arose in *S. v. McCravy,* 181 S. E. (Tenn.), 165, in which George W. McCravy and another were prosecuted for an assault upon Mrs. McCravy with intent to commit murder in the first degree. A part of the main testimony relied on for conviction was that of Doctor Myers, an expert witness, who said that Mrs. McCravy could not herself have inflicted the wound in her head or in her left arm. In reviewing an exception to this testimony the Court said: "We are of opinion that it was error to permit him to give his opinion as an expert, or to state as he did, in substance, positively that the bullet could not have been shot by Mrs. McCravy in the manner in which she was shot. Testimony is permissible allowing an expert to state a conclusion or give an opinion on a subject which is peculiarly a matter of superior knowledge on his part, for the reason that the lay mind is not so competent to form an opinion or reach a conclusion. Such expert opinion or conclusion, however, may be per-

STATE *v.* CARR.

mitted only in matters peculiarly within the knowledge of an expert. The question whether a delicate woman can reach around with the right hand and shoot herself in the left side of the head, or whether she can do so at the same time shooting herself through the left arm, is not peculiarly a matter of expert learning upon the part of a physician. This is a conclusion which the ordinary, practical mind may reach, as well as the trained physician, and can be more readily reached by one trained in the use of firearms. Whether Mrs. McCravy shot herself was the ultimate fact to be reached by the jury, because if she shot herself it necessarily follows that both defendants were innocent. To permit the doctor to say whether it was possible for her to do this, when the jury could as well reach the same conclusion, was an invasion of their province. *Telephone and Telegraph Co. v. Mill Co.,* 129 Tenn., 374, 381, 382, 164 S. W., 1145."

The evidence is not sufficient to sustain a verdict against Robert Carr, nothing appearing beyond speculation or conjecture on which to base an inference of conspiracy or concert of action between him and his mother, and as to him the demurrer to the evidence should have been sustained. C. S., 4643. With Dr. Quinn's answer to the question excluded, is there any evidence against Nellie, the widow of the deceased?

In considering a motion to dismiss the action under the statute, we are merely to ascertain whether there is any evidence to sustain the indictment; and in deciding the question we must not forget that the State is entitled to the most favorable interpretation of the circumstances and of all inferences that may fairly be drawn from them. *S. v. Carlson,* 171 N. C., 818; *S. v. Rountree,* 181 N. C., 535. It is not the province of this Court to weigh the testimony and determine what the verdict should have been, but only to say whether there was any evidence for the jury to consider; if there was, the jury alone could determine its weight. *S. v. Cooke,* 176 N. C., 731.

From a critical examination of the evidence, which covers about twenty-five pages, we are convinced that there was no error in denying Nellie's motion to dismiss the action. It is true that a disclosure of the facts attending the homicide is dependent to a large extent upon her testimony; but there is at least some testimony and some natural evidence in contradiction, the consideration of which we cannot withhold from the jury.

The entire evidence points with certainty to one of two conclusions: the deceased killed himself or his wife killed him. Unquestionably there is evidence in support of the theory that the deceased himself fired the fatal shot. But the question for decision is whether there is any evidence which, taken to be true, is inconsistent with this theory. The evi-

dence relied upon by the State, if accepted by the jury, discloses circumstances which tend to repel the probability, if not the possibility, of suicide.

For error in the admission of testimony Nellie Carr is entitled to a new trial.

As to Robert Carr, reversed. As to Nellie Carr, new trial.